## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

JOSE R. ROSADO,

        Plaintiff,

vs.                               Case No.  3:19-cv-1428-MMH-PDB

CARLOS DEL TORO, Secretary,
Department of the Navy,

        Defendant.

_____/

## O R D E R

**THIS CAUSE** is before the Court on Defendant's Motion for Summary
Judgment (Doc. 34; Motion), filed March 12, 2022.  In the Motion, Defendant
Secretary of the Navy Carlos Del Toro (the Secretary) requests that the Court
enter summary judgment in his favor on all claims raised in Plaintiff Jose R.
Rosado's Amended Complaint and Demand for Jury Trial (Doc. 5; Amended
Complaint), filed January 16, 2020. See Motion at 29.  Rosado filed a response
in opposition to the Motion.  See Plaintiff's Response in Opposition to
Defendant's Motion for Summary Judgment (Doc. 46; Response), filed April 18,
2022.  The Secretary then filed a reply.  See Defendant's Reply Memorandum
in Support of Summary Judgment (Doc. 50; Reply), filed May 17, 2022.
Accordingly, this matter is ripe for review.

## I.    Background[1]

Rosado was born in 1957 in Colombia and is Hispanic.  See Deposition of Jose R. Rosado (Doc. 36-1; Rosado Dep.) at 5; Declaration of Jose R. Rosado (Doc. 47-1; Rosado Decl.) at 5–6; Rosado Decl., Ex. 5 (Doc. 47-6; CIO Statistics) at 2. He served in the U.S. Marine Corps for around twenty years.  See Rosado Decl. at 2.  After his military service, from March 1998 to November 2007, Rosado held various information technology (IT) positions.  See id. at 1–2.  Since November 2007, the Secretary has employed Rosado as an IT specialist in the Naval Facilities Engineering Systems Command Southeast (NAVFAC).  See Rosado Dep. at 2.  Rosado works in NAVFAC's Command Information Office (CIO), which has five divisions.  See Declaration of Andrea Freeman (Doc. 37-1; Freeman Decl.) at 3.  He is assigned to CIO3, a division that handles customer support, provides technical expertise, and manages equipment such as computers as well as wireless and landline devices.  See Rosado Dep. at 2–3; Freeman Decl. at 4.  Until 2016, Rosado held a GS-11 position on the General Schedule (GS) salary table.  See Rosado Dep. at 24, 37.

---

[1]  For the purposes of resolving the Secretary's Motion, the Court views all disputed facts and reasonable inferences in the light most favorable to Rosado.  However, the Court notes that these facts may differ from those that ultimately can be proved at trial.  See Lee v. Ferraro, 284 F.3d 1188, 1190 (11th Cir. 2002).

The Court's citations to page numbers in documents in the record refer to the CM-ECF-stamped page numbers located at the top of each page, rather than a document's internal page numbers, if any.

Before May 2014, Linda Dailey led CIO and was Rosado's second-level supervisor. See id. at 5. And until September 2014, Jeffrey Kohler was Rosado's first-level supervisor as the head of CIO3. See id.; Supplemental Declaration of Andrea Freeman (Doc. 51-1; Freeman Supp. Decl.) at 2. Rosado alleges that Dailey and Kohler harassed him and failed to protect him from harassment between 2012 and July 2014.[2] See Amended Complaint ¶¶ 9–14. According to Rosado's coworker Charlie Weaver, Dailey and Kohler's treatment of Rosado was not unique; they did not treat any of the staff "with much respect." See Declaration of Charlie Weaver (Doc. 52-1; Weaver Decl.) at 2. Rosado filed equal employment opportunity (EEO) complaints on October 14, 2011, and November 28, 2012. See Declaration of Robert G. Palmer (Doc. 38-1; Palmer Decl.) at 2; Palmer Decl., Ex. 6 (Doc. 38-7; Final Agency Decision) at 1.

Dailey retired in May 2014, leaving Kohler and Venita Hollinger to share the responsibility of leading CIO until September 2014. See Rosado Dep. at 5. On either September 10 or September 19, 2014, Rosado learned that he was not selected for a GS-12 IT specialist position in the Industrial Control Systems (ICS) branch of CIO3 under vacancy announcement number 1082872 (Vacancy # '872). See id. at 22. Lewis Fleming, a White male born in 1974, was selected

---

[2] In paragraphs 9 through 15 of the Amended Complaint, Rosado alleges several incidents which he describes "as relevant background information" about his employment at NAVFAC. Response at 3. The Court has considered these alleged incidents and finds that they are not probative of the discrimination or retaliation claims that Rosado is bringing in this action.

for the position.  See id.; CIO Statistics at 2.  For Vacancy # '872, Kohler was the selecting official, and David Gober, NAVFAC's business director, was the approving official.  See Rosado Dep. at 14–15, 23; Freeman Decl. at 6.

Rosado contacted EEO counsel on October 30, 2014, and filed a formal EEO complaint on December 10, 2014.  See Palmer Decl. at 2.  In that complaint, he alleged that he was not selected for Vacancy # '872 because of discrimination based on race, national origin, age, and prior EEO activity.  See Palmer Decl., Ex. 2 (Doc. 38-3; EEO Complaint of Dec. 10, 2014) at 2.  Rosado also asserted that he was experiencing a hostile work environment.  See Rosado Decl., Ex. 3 (Doc. 47-4; Amendment to EEO Claim) at 2–3.  Rosado named Kohler, Hollinger, and Freeman (among others) in his EEO complaint.  See EEO Complaint of Dec. 10, 2014, at 2–3; Amendment to EEO Claim at 2–3.

On September 7, 2014, Andrea Freeman became the command information officer leading CIO.  See Deposition of Andrea Freeman (Doc. 35-1; Freeman Dep.) at 2.  During her first week on the job, Freeman met individually with each staff member.  See id. at 3.[3]  At Freeman's meeting with Rosado, he told her about his prior EEO activity (he had not yet submitted the 2014 EEO Complaint).  See id.; Freeman Decl. at 2; Rosado Dep. at 28.

---

[3] Kohler passed away on September 26, 2014.  See id. at 8.

Soon after starting at CIO, Freeman decided to transfer the ICS branch from CIO3 into a new division, CIO4.  <u>See</u> Weaver Decl. at 3.  Freeman planned for CIO4 to have a director and three GS-12 IT specialists.  <u>See</u> Freeman Supp. Decl. at 5 & n.5.  Weaver held one of the three GS-12 positions, but the director position and the other two GS-12 positions were vacant.  <u>See</u> <u>id.</u>  On December 28, 2014, Freeman promoted Weaver to be the CIO4 director.  <u>See</u> <u>id.</u> at 9 n.10. Weaver and Leon Ravenscroft, a White male born in 1971, asked Freeman to consider converting Ravenscroft from a temporary employee in CIO3 to a permanent employee in CIO4.  <u>See</u> Weaver Decl. at 5; Freeman Dep. at 11; Freeman Decl. at 12; CIO Statistics at 2.  After Freeman agreed, Ravenscroft received an offer on December 29, 2014.  <u>See</u> Freeman Supp. Decl. at 6–7. Because Weaver vacated a GS-12 position and Ravenscroft filled one, CIO4 still had two vacant GS-12 positions.  <u>See</u> <u>id.</u> at 9; Weaver Decl. at 6.

To fill those positions, a job posting under vacancy announcement number 1276490 (Vacancy # '490) for a GS-12 IT specialist position in CIO4 opened on USAJOBS.gov from December 12, 2014, until December 19, 2014.  <u>See</u> Freeman Supp. Decl. at 8.  Rosado applied but was not selected for the position.  <u>See</u> <u>id.</u> at 11–12.  Based on Weaver's recommendations, on March 11, 2015, Freeman name-selected Greg Snead, a White male born in 1963, and Anthony Joshua, a Black male born in 1982, to fill the positions.  <u>See</u> Freeman Dep. at 8–9; Freeman Decl. at 19; CIO Statistics at 2.  A few weeks later, in April 2015,

Freeman temporarily moved Joshua from CIO4 to CIO3 to help with understaffing there. See Weaver Decl. at 12; Freeman Dep. at 9; Freeman Decl. at 22.

Rosado recalls that, on April 1, 2015, Freeman addressed all CIO personnel in a meeting and said something to the effect of, "If you don't want to be here, the door is open. I'm tired of people walking on eggshells. I'm not going backwards. We're moving forward. I'm not afraid of EEO or the union. Bring it on." See Rosado Dep. at 20; Freeman Dep. at 4–5. On April 13, 2015, Rosado added new allegations to the EEO complaint that he had filed on December 10, 2014. See Amendment to EEO Claim at 1–2. Specifically, he asserted that he was discriminated against on the basis of race, national origin, age, and prior EEO activity when he was not selected for Vacancy # '490 and when Freeman "berated" him in the group meeting on April 1, 2015. Id.

In Spring or Summer 2015, Wyatt Pruitt took over as the CIO3 director. See Rosado Dep. at 4–5. On August 10, 2015, Pruitt offered Rosado the opportunity for "cross training and temporary promotion" to a GS-12 position. See Freeman Decl. at 24; Freeman Decl., Attachment 7 (Doc. 37-7; Temporary Promotion Email) at 1; Rosado Dep. at 34–35. Rosado accepted the offer and began performing the work. See Rosado Dep. at 34. However, Freeman never processed a temporary promotion, and Rosado never received extra pay. See id. at 36–37; Freeman Dep. at 12; Freeman Decl. at 25.

In October 2015, Pruitt asked Freeman to permanently transfer Joshua to the Network Services branch in CIO3. See Freeman Decl. at 26. Because Joshua had relevant experience in that area and the branch was short-staffed, Freeman agreed and transferred Joshua to a permanent position in CIO3. See id.; Weaver Decl. at 12. In February of 2016, after reorganizing the branches in CIO3 and CIO4, Freeman moved Snead from CIO4 to CIO3. See Weaver Decl. at 12; Freeman Decl. at 27. Around that time, Freeman worked to upgrade all of CIO's GS-11 positions to GS-12. See Freeman Dep. at 13; Freeman Decl. at 5. As a result, on June 12, 2016, Rosado was name-selected to a GS-12 telecommunications position. See Rosado Dep. at 37; Freeman Decl. at 5. Of the four occupied GS-11 positions in CIO, Rosado's position was the first to be upgraded to GS-12. See Freeman Decl. at 5, 27–28.

Pruitt left CIO3 on November 12, 2017. See id. at 28. Rosado and Joshua applied for the vacant GS-13 supervisory position, and the selection panel interviewed both of them. See Rosado Dep. at 39. After reviewing resumes and conducting interviews, the panel recommended Joshua. See Freeman Decl. at 32; Freeman Decl., Attachment 10 (Doc. 37-10; Selection for GS-13 Position) at 1. Freeman followed the panel's recommendation, and Joshua became the CIO3 director on February 4, 2018. See Freeman Decl. at 32; Freeman Dep. at 14. Rosado contacted EEO counsel on February 7, 2018, and filed a formal

complaint about his non-selection for the supervisory IT position on March 19, 2018.  See Palmer Decl. at 2.

Rosado initiated this action on December 12, 2019, and filed the operative eighteen-count Amended Complaint on January 16, 2020.  See generally Complaint and Demand for Jury Trial (Doc. 1); Amended Complaint.  In his Amended Complaint, Rosado asserts claims pursuant to Title VII of the Civil Rights of Act of 1964 (Title VII), 42 U.S.C. § 2000e-16, and the Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C. § 633a.  See generally Amended Complaint.  Counts I (race and national origin discrimination), VI (Title VII retaliation), and XI (age discrimination) arise from Rosado's non-selection for Vacancy # '872.  See id. ¶¶ 18, 37, 52.  Counts II (race and national origin discrimination), VII (Title VII retaliation), and XII (age discrimination) are based on Rosado's non-selection for Vacancy # '490.  See id. ¶¶ 22, 40, 55.  Counts III (race and national origin discrimination), VIII (Title VII retaliation), XIII (age discrimination), and XVI (ADEA retaliation) arise from Ravenscroft's non-competitive promotion.  See id. ¶¶ 26, 43, 58, 67.  The claims in counts IV (race and national origin discrimination), IX (Title VII retaliation), XIV (age discrimination), and XVII (ADEA retaliation) are based on the alleged denial of his temporary promotion to GS-12.  See id. ¶¶ 30, 46, 61, 70.  Counts V (race and national origin discrimination), X (Title VII retaliation), XV (age discrimination), and XVIII (ADEA retaliation) arise from

Rosado's non-selection for the CIO3 supervisory position.  See id. ¶¶ 34, 49, 64, 73.

## II.   Standard of Review

Under Rule 56 of the Federal Rules of Civil Procedure (Rule(s)), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Rule 56(a).  The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Rule 56(c)(1)(A).[4]  An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the nonmovant.  See

---

[4] Rule 56 was revised in 2010 "to improve the procedures for presenting and deciding summary-judgment motions."  Rule 56 Advisory Committee's Note 2010 Amends.

> The standard for granting summary judgment remains unchanged.  The language of subdivision (a) continues to require that there be no genuine dispute as to any material fact and that the movant be entitled to judgment as a matter of law.  The amendments will not affect continuing development of the decisional law construing and applying these phrases.

Id.  "[A]lthough the interpretations in the advisory committee['s] notes are not binding, they are highly persuasive."  Campbell v. Shinseki, 546 F. App'x 874, 879 n.3 (11th Cir. 2013).  Thus, case law construing the former Rule 56 standard of review remains viable and is applicable here.

In citing to Campbell, the Court notes that it does not rely on unpublished opinions as binding precedent; however, they may be cited in this Order when the Court finds them persuasive on a particular point.  See McNamara v. GEICO, 30 F.4th 1055, 1060–61 (11th Cir. 2022); see also Fed. R. App. P. 32.1; 11th Cir. R. 36–2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)).  "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." Kesinger ex rel. Est. of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial.  See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).  "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593–94 (11th Cir. 1995) (internal citations and quotation marks omitted).  Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248; see also McCormick v. City of Ft. Lauderdale, 333 F.3d 1234, 1243 (11th Cir. 2003) ("The mere existence of some factual dispute will not defeat summary judgment unless the factual dispute is material to an issue affecting the outcome of the case.").  In

determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995) (citing Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro, 38 F.3d 1571, 1578 (11th Cir. 1994)).

## III.   Applicable Law

Title VII provides that "[a]ll personnel actions affecting employees" of the military departments "shall be made free from any discrimination based on race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-16(a). Similarly, the ADEA mandates that "personnel actions" affecting individuals "who are at least 40 years of age" in the military departments "shall be made free from any discrimination based on age." 29 U.S.C. § 633a(a). Both statutes also prohibit retaliation against any federal employee who engages in protected activity. See Babb v. Sec'y, Dep't of Veterans Affs. (Babb II), 992 F.3d 1193, 1203–04 (11th Cir. 2021). A plaintiff bringing a claim of discrimination or retaliation can prove that claim through direct or circumstantial evidence. See Cooper v. S. Co., 390 F.3d 695, 723–24 (11th Cir. 2004), overruled in part on other grounds by Ash v. Tyson Foods, Inc., 546 U.S. 454 (2006); Lewis v. Sec'y of U.S. Air Force, No. 20-12463, 2022 WL 2377164, at *9 (11th Cir. June 30, 2022). Here, Rosado relies on circumstantial evidence. See Response at 5–6.

Ordinarily, when evaluating ADEA and Title VII claims premised on circumstantial evidence, courts apply the burden-shifting framework articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  See Lewis, 2022 WL 2377164, at *9.  Under this framework, a plaintiff first must raise an inference of discrimination or retaliation by presenting evidence satisfying the elements of a prima facie case.  Lewis v. City of Union City (Lewis I), 918 F.3d 1213, 1220–21 (11th Cir. 2019) (en banc); Taylor v. Runyon, 175 F.3d 861, 868 (11th Cir. 1999).  Establishing a prima facie case "'eliminates the most common nondiscriminatory reasons' for the employer's treatment of the plaintiff—and in so doing 'give[s] rise to an inference of unlawful discrimination.'"  Lewis I, 918 F.3d at 1222 (alteration in original) (quoting Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253–54 (1981)).  If the plaintiff presents a prima facie case, "the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions."  Id. at 1221; see Taylor, 175 F.3d at 868.  Once the defendant articulates such reasons, "the plaintiff must then demonstrate that the defendant's proffered reason was merely a pretext for unlawful discrimination, an obligation that 'merges with the [plaintiff's] ultimate burden of persuading the [factfinder] that [he] has been the victim of intentional discrimination.'"  Lewis I, 918 F.3d at 1221 (first and second alterations in original) (quoting Burdine, 450 U.S. at 256); see Taylor, 175 F.3d at 868.

However, recent cases from the Supreme Court and the Eleventh Circuit Court of Appeals have rejected use of the full McDonnell Douglas framework in the federal employment context.  See Babb v. Wilkie (Babb I), 140 S. Ct. 1168, 1171–72 (2020); Babb II, 992 F.3d at 1204.  In Babb, the plaintiff sued her employer, the Secretary of the U.S. Department of Veterans Affairs, alleging claims of age and sex discrimination and retaliation.  Babb I, 140 S. Ct. at 1171.  Applying the traditional McDonnell Douglas framework, the district court granted summary judgment for the Secretary on all claims.  Id. at 1172.  Babb appealed.  In doing so, she argued that her federal-sector ADEA claim should be evaluated using a "motivating-factor" causation standard rather than the stricter McDonnell Douglas "but-for" causation standard applied by the district court.  Babb v. Sec'y, Dep't of Veterans Affs., 743 F. App'x 280, 287 (11th Cir. 2018).  The Eleventh Circuit recognized some merit in her contention given the language of the ADEA provision governing federal-sector employees.  Id.  Nevertheless, finding her argument foreclosed by binding circuit precedent, the court affirmed the grant of summary judgment on the ADEA claim applying the traditional McDonnell Douglas analysis with its but-for causation standard.  Id. at 287–89.  Babb also argued that her retaliation claim should be evaluated using a motivating-factor causation standard.  Id. at 290.  But again the court concluded that circuit precedent required application of the but-for causation standard.  Id.  As such, the Eleventh Circuit affirmed the grant of summary

judgment as to the age discrimination and the Title VII retaliation claims as well.  Babb I, 140 S. Ct. at 1172.

The Supreme Court granted certiorari to "resolve a Circuit split over the interpretation of" the ADEA's federal-sector prohibition against discrimination. Id.  In arguing that the Eleventh Circuit decision should be affirmed, the government urged the Court to apply the traditional standard for establishing causation, which it described as: "even if age played a part in such a decision, an employee or applicant for employment cannot obtain any relief unless it is shown that the decision would have been favorable if age had not been taken into account." Id.  In contrast, the plaintiff argued that the ADEA "prohibits any adverse consideration of age in the decision-making process." Id.  The Supreme Court resolved the dispute finding that the ADEA's federal-sector prohibition against discrimination requires that the employment decision must be untainted by discrimination, meaning that age discrimination must not play "any part in the way a decision is made." Id. at 1174.  Thus, a plaintiff does not have to prove that age was "a but-for cause of the ultimate decision." Id. Rather, a plaintiff must show that age was "the but-for cause of differential treatment." Id.[5]  But, when the consideration of age played "no role in the final decision," the ADEA is not violated.  Id. at 1174 n.3.

_____

[5] The Court qualified its decision by stating that "plaintiffs who demonstrate only that they were subjected to unequal consideration cannot obtain reinstatement, backpay,

On remand from the Supreme Court, the Eleventh Circuit, in accordance with the Supreme Court's mandate, reversed the entry of summary judgment as to the age discrimination claims, but initially affirmed, again, the entry of summary judgment on the retaliation claim.  See Babb II, 992 F.3d at 1195.  On rehearing, however, the court determined that Babb I undermined its prior precedent to the point of abrogating it.  Id. at 1196, 1200.  As such, applying the Babb I Court's interpretation of the ADEA to the identical "free from any discrimination" language in Title VII, the court determined that a federal-sector employer may be liable under Title VII for discrimination, including retaliation, in the absence of a showing that discrimination was the but-for cause of the ultimate outcome.  Id. at 1205.  Instead, an employee need only show that consideration of the protected characteristic was the but-for cause of differential treatment.  Id.  The Eleventh Circuit summarized the proper standard as follows:

> If a decision is not "made free from any discrimination based on" that which § 2000e-16(a) protects, then an employer may be held liable for that discrimination regardless of whether that discrimination shifted the ultimate outcome. So long as the protected characteristic is "the but-for cause of differential treatment," then it doesn't matter (for purposes of liability) that the protected characteristic isn't "a but-for cause of the ultimate decision."

---

compensatory damages, or other forms of relief related to the end result of an employment decision.  To obtain such remedies, these plaintiffs must show that age discrimination was a but-for cause of the employment outcome."  Id. at 1177–78.  When "age discrimination played a lesser part in the decision, other remedies," such as injunctive relief, "may be appropriate."  Id. at 1171, 1178.

Id. at 1205 (quoting Babb I, 140 S. Ct. at 1174).  Based on the Supreme Court's reasoning, the Eleventh Circuit noted that, "even when there are non-pretextual reasons for an adverse employment decision . . . the presence of those reasons doesn't cancel out the presence, and the taint, of discriminatory considerations." Id. at 1204.  Thus, "[w]ithout quite saying as much, . . . it seems that the Supreme Court accepted Babb's argument 'that the District Court should not have used the McDonnell Douglas framework.'"  Id.

Fourteen months later, in an unpublished decision, Lewis v. Secretary of the U.S. Air Force, a panel of the Eleventh Circuit carefully analyzed which portions of McDonnell Douglas had been rejected by Babb I and Babb II.  See Lewis, 2022 WL 2377164, at *10–11.  The court reasoned that Babb I and Babb II had rejected the second and third steps of the McDonnell Douglas framework but had not rejected the first step of requiring a plaintiff to show a prima facie case:

> Babb I and Babb II foreclosed using the full McDonnell Douglas framework regarding ADEA claims and Title VII retaliation claims as to federal-sector employees, but those two opinions concerned the second and third steps of that framework . . . . [A] federal sector employee alleging Title VII and ADEA claims must still establish a prima facie case that a decision was not "made free from any discrimination" . . . .

Id. at *10 (citation omitted); see also Malone v. U.S. Att'y Gen., 858 F. App'x 296, 300–01 (11th Cir. 2021) (per curiam) ("[T]he McDonnell Douglas

framework no longer applies to claims brought under 42 U.S.C. § 2000e-16(a). Specifically, the fact that there may be non-pretextual reasons for an adverse employment action 'doesn't cancel out the presence, and the taint, of discriminatory reasons.'" (quoting <u>Babb II</u>, 992 F.3d at 1204)).  Several other unpublished Eleventh Circuit decisions have continued to require plaintiffs to satisfy the first step of the <u>McDonnell Douglas</u> framework by establishing a <u>prima facie</u> case of discrimination or retaliation.  <u>See</u> <u>Lewis</u>, 2022 WL 2377164, at *10–11 (discrimination); <u>Troupe v. DeJoy</u>, 861 F. App'x 291, 294 (11th Cir. 2021) (per curiam) (discrimination); <u>Malone</u>, 858 F. App'x at 303 (retaliation); <u>Varnedoe v. Postmaster Gen.</u>, No. 21-11186, 2022 WL 35614, at *2 (11th Cir. Jan. 4, 2022) (per curiam) (retaliation).

Here, while acknowledging <u>Babb I</u> and <u>Babb II</u>, both parties apply the elements of a <u>prima facie</u> case to Rosado's claims.  <u>See</u> Motion at 7, 17, 19–20; Response at 5–6.  Consistent with the contentions of the parties, which are supported by the persuasive authority of <u>Lewis</u>, <u>Troupe</u>, <u>Malone</u>, and <u>Varnedoe</u>, the Court will analyze whether Rosado has established a <u>prima facie</u> case that supports an inference of discrimination or retaliation.  In conducting its review, the Court will focus on whether Rosado has produced evidence that creates an inference that he suffered <u>differential treatment</u> based on his protected characteristics, regardless of whether discrimination or retaliation was "a but-for cause of <u>the ultimate decision[s]</u>."  <u>Babb II</u>, 992 F.3d at 1205.

## A.    **Prima Facie Case of Discrimination**[6]

To establish a prima facie case of discrimination under the McDonnell Douglas framework, a plaintiff must demonstrate "(1) that [he] belongs to a protected class, (2) that [he] was subjected to an adverse employment action, (3) that [he] was qualified to perform the job in question, and (4) that [his] employer treated 'similarly situated' employees outside [his] class more favorably." Lewis I, 918 F.3d at 1220–21; see Lewis, 2022 WL 2377164, at *9.  To meet the fourth element, a plaintiff "must show that [he] and [his] comparators are 'similarly situated in all material respects.'"  Lewis I, 918 F.3d at 1226.  This comparator analysis remains important after Babb II.  See Lewis, 2022 WL 2377164, at *10–11 ("[N]either Babb I nor Babb II suggested that the comparator analysis in Lewis I is inappropriate under the new standards."); Troupe, 861 F. App'x at 293–94 (rejecting a plaintiff's case because she had "failed to identify an appropriate 'comparator'"); Malone, 858 F. App'x at 301 ("Malone says that differential treatment can be inferred by the fact that he was more qualified

---

[6] Apart from the McDonnell Douglas test for a prima facie case, Rosado could survive summary judgment if he produces a convincing mosaic of circumstantial evidence that he suffered differential treatment during the decision-making process because of discrimination. See Lewis v. City of Union City (Lewis II), 934 F.3d 1169, 1185 (11th Cir. 2019); Troupe, 861 F. App'x at 294–95; Lewis, 2022 WL 2377164, at *9.  Evidence which may create a convincing mosaic includes "(1) 'suspicious timing, ambiguous statements . . . , and other bits and pieces from which an inference of discriminatory intent might be drawn,' (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual."  Lewis II, 934 F.3d at 1185 (alteration in original) (quoting Silverman v. Bd. of Educ. of City of Chi., 637 F.3d 729, 733–34 (7th Cir. 2011), overruled by Ortiz v. Werner Enters., Inc., 834 F.3d 760 (7th Cir. 2016)).

than [the selected candidates].  But that contention is not supported by the record.").   In the context of promotion decisions, the Eleventh Circuit has phrased the elements of a prima facie case this way: "(1) that the plaintiff belongs to a protected class; (2) that [he] applied for and was qualified for a promotion; (3) that [he] was rejected despite [his] qualifications; and (4) that other equally or less-qualified employees outside [his] class were promoted."[7] Brown v. Ala. Dep't of Transp., 597 F.3d 1160, 1174 (11th Cir. 2010).  Notably, a plaintiff's subjective opinion, by itself, "is insufficient to establish [his] qualification."  Cooper, 390 F.3d at 743.

### B.   Prima Facie Case of Retaliation

To establish a prima facie case of retaliation, a plaintiff must show "(1) statutorily protected expression, (2) adverse employment action, and (3) a causal link between the protected expression and the adverse action."  Taylor, 175 F.3d at 868 (quoting Goldsmith v. City of Atmore, 996 F.2d 1155, 1163 (11th Cir. 1993)); Malone, 858 F. App'x at 303; Varnedoe, 2022 WL 35614, at *2.  To satisfy the causal connection requirement of a prima facie case, the plaintiff

---

[7] According to the Secretary, Rosado must show that "no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over [Rosado]." Motion at 20, 25 (quoting Cotton v. Enmarket, Inc., 809 F. App'x 723, 725–26 (11th Cir. 2020) (per curiam)).   The court in Cotton applied the "no reasonable person" standard when analyzing the second and third steps of the McDonnell Douglas framework.  See Cotton, 809 F. App'x at 725–26.  The Secretary provides no support for his apparent contention that the "no reasonable person" test applies after the court in Babb II rejected using the second and third steps of that framework.

"need only establish that 'the protected activity and the adverse action were not wholly unrelated.'"  Taylor, 175 F.3d at 868 (quoting Goldsmith, 996 F.2d at 1163); see Brown, 597 F.3d at 1182.

## IV.   Discussion

As to Rosado's claims of race, national origin, and age discrimination, the Secretary concedes that Rosado has satisfied the first three elements of the prima facie case: Rosado belongs to protected classes (race, national origin, and age); he applied for and was qualified for each promotion; and he was rejected despite his qualifications.  See Motion at 19–20, 22, 24.  On the final element, the parties agree that those selected were outside Rosado's protected classes, but the parties dispute whether the selectees were equally or less qualified than Rosado.  See id. at 22, 24, 26, 28; Response at 19–23, 25.  Similarly, regarding the retaliation claims, the parties agree that Rosado engaged in protected activity and suffered adverse employment actions.  However, they dispute Rosado's ability to satisfy the third element—whether there is a causal connection between the protected activities and the adverse employment actions.  See Motion at 19, 22, 25–26; Response at 6–9, 11–12, 23–24; Reply at 3, 9.  Therefore, for each of Rosado's claims, the Court will focus on whether Rosado has produced evidence to create a triable issue of fact about the final element of a prima facie case of discrimination or retaliation.

### A.    Counts I, VI, and XI: Vacancy # '872

The Secretary contends that the Court should grant summary judgment in his favor on Rosado's claims regarding Vacancy # '872 because Rosado failed to exhaust his administrative remedies and because discrimination and retaliation played no part in the employment decision. See Motion at 4; Reply at 2. The Court will address each argument in turn.

#### 1.    Exhaustion

The Secretary argues that Rosado failed to properly exhaust his administrative remedies by contacting an EEO counselor within 45 days of learning on September 10, 2014, that he was not selected for Vacancy # '872. See Motion at 4 (citing the Amended Complaint ¶ 18). In his Response, Rosado asserts that his claim is not barred because he did not receive "unequivocal notice" of his non-selection until USAJOBS.gov emailed him on September 19, 2014. See Response at 3–4.

Typically, before bringing Title VII or ADEA claims in court, federal employees must "initiate administrative review of any alleged discriminatory or retaliatory conduct with the appropriate agency within 45 days of the alleged discriminatory act."[8] Shiver v. Chertoff, 549 F.3d 1342, 1344 (11th Cir. 2008)

---

[8] Federal employees have two avenues of relief under the ADEA. See Watson v. Tenn. Valley Auth., 867 F. Supp. 2d 1215, 1220 (N.D. Ala. 2012). Because Rosado chose to use the EEOC's administrative process, he was required to comply with the 45-day requirement. See id.

(per curiam); see Brady v. Postmaster Gen., 521 F. App'x 914, 916 (11th Cir. 2013) (per curiam); 29 C.F.R. §§ 1614.103(a), 1614.105(a)(1) (2022). "Generally, when the claimant does not initiate contact within the 45-day charging period, the claim is barred for failure to exhaust administrative remedies." Shiver, 549 F.3d at 1344.

Rosado contacted an EEO counselor on October 30, 2014. See Rosado Decl., Ex. 2 (Doc. 47-3; Counselor's Report) at 1. As a result, any claims arising from incidents before September 15, 2014, are barred for his failure to exhaust his administrative remedies. See Shiver, 549 F.3d at 1344; 29 C.F.R. § 1614.105(a)(1). In his Amended Complaint, Rosado alleges that he learned of his non-selection "[o]n or about September 10, 2014."[9] Amended Complaint ¶ 18. Similarly, in his deposition, Rosado agreed that September 10 was the date he learned of his non-selection. See Rosado Dep. at 22. But, in his declaration, Rosado states that he did not recall the exact date during his deposition and that September 19 is the correct date. See Rosado Decl. at 3. Also, Rosado has

---

In citing to Watson, the Court notes that although decisions of other district courts are not binding, they may be cited as persuasive authority. See Stone v. First Union Corp., 371 F.3d 1305, 1310 (11th Cir. 2004) (noting that, "[a]lthough a district court would not be bound to follow any other district court's determination, the decision would have significant persuasive effects").

[9] Because of the phrase "on or about," the Secretary was on notice that the exact date may be slightly different from the date alleged in the Amended Complaint. Cf. United States v. Reed, 887 F.2d 1398, 1403 (11th Cir. 1989) (noting that the phrase "on or about" in an indictment puts the defendant on notice "that the charge is not limited to the specific date or dates set out in the indictment" and finding that a one-month variance was not impermissible).

produced an email notification of his non-selection, which is dated September 19, 2014. <u>See</u> Rosado Decl., Ex. 1 (Doc. 47-2). Additionally, Rosado reported to the EEO counselor that his non-selection occurred on September 19, and that he learned of the non-selection on September 19. <u>See</u> Counselor's Report at 1.[10] And, in his formal EEO complaint, Rosado listed September 19 as the relevant date. <u>See</u> EEO Complaint of Dec. 10, 2014, at 2.

When a defendant challenges a claim for failure to exhaust administrative remedies, the Court may resolve factual disputes "so long as the factual disputes do not decide the merits and the parties have sufficient opportunity to develop a record." <u>Bryant v. Rich</u>, 530 F.3d 1368, 1376 (11th Cir. 2008); <u>see</u> <u>Tillery v. U.S. Dep't of Homeland Sec.</u>, 402 F. App'x 421, 424 (11th Cir. 2010) (per curiam) (applying <u>Bryant</u>'s reasoning to a federal-sector discrimination case). Here, for the purposes of resolving the issues before the Court on summary judgment, the Court concludes that the weight of the evidence shows that the personnel action became effective on September 19, 2014, and that Rosado learned about the action on September 19, 2014.

---

[10] In his Reply, the Secretary states that, in the "EEO Counselor's Report dated December 16, 2014, the counselor noted that [Rosado] gained knowledge of his non-selection on September 10, 2014." Reply at 2 n.1. To support this statement, the Secretary cites "Navy_0038-0045." <u>Id.</u> The Counselor's Report in the record is dated December 15, 2014, not December 16. <u>See</u> Counselor's Report at 8. Moreover, despite diligently searching the record, the Court has not found a document with the Bates-stamps "Navy_0038-0045."

Therefore, the Court declines to find that Rosado failed to properly exhaust his administrative remedies as to these claims.

### 2. Merits[11]

On the merits of Rosado's claims arising from Vacancy # '872, the Secretary argues that Rosado has not shown that discrimination or retaliation was the but-for cause of any differential treatment. See Reply at 2–3. The Secretary contends that the selection panel correctly found that Fleming was more qualified than Rosado. See id. And, according to the Secretary, there is no causal connection between Fleming's selection in August 2014 and Rosado's prior EEO activity. See id. at 3.

To fill Vacancy # '872, Kohler chose to use a selection panel. See Declaration of Clarence Luther Guthrie III, dated April 23, 2015 (Doc. 53-3; First Guthrie Decl.) at 7. The selection panel included Kohler, Scott West, and Clarence "Luke" Guthrie. See Freeman Supp. Decl. at 3; First Guthrie Decl. at

---

[11] In the Motion, the Secretary's only asserted reason for granting summary judgment as to Counts I, VI, and XI was that those claims are untimely. See Motion at 3–6. Thus, in the Response, Rosado only addressed the timeliness of his contact with the EEO counselor. See Response at 9–10. But, in the Reply, likely in light of Rosado's evidence on the exhaustion issue, the Secretary argued the merits of those claims and attached several new exhibits. See Reply at 2–3. The Court recognizes that "[d]istrict courts abuse their discretion when they deny a party a chance to respond to new arguments or facts raised for the first time in a reply brief in support of a motion for summary judgment and subsequently enter judgment on the basis of those new arguments or facts." Carrizosa v. Chiquita Brands Int'l, Inc., 47 F.4th 1278, 1299 (11th Cir. 2022) (alteration in original) (quoting Physicians Healthsource, Inc. v. A-S Medication Sols., LLC, 950 F.3d 959, 968 (7th Cir. 2020)). However, despite being represented by experienced counsel, Rosado did not seek leave to respond to the new arguments and evidence cited in the Reply. Therefore, the Court will proceed with ruling on the merits of the discrimination and retaliation claims.

3.  Rosado had no prior issues with West or Guthrie, who were not employees in CIO.  See Rosado Dep. at 23.  West and Guthrie were unaware of Rosado's age, national origin, or prior EEO activity.  See Declaration of Scott West (Doc. 53-2; West Decl.) at 2–3; First Guthrie Decl. at 2–3.  While West assumed that Rosado was Hispanic, Guthrie was not sure whether he knew Rosado's race.  See West Decl. at 2; First Guthrie Decl. at 2.

The panel reviewed seventeen resumes, including Rosado's and Fleming's.  See First Guthrie Decl. at 3.  The panel ranked the resumes according to standardized criteria in five categories.  See id.  The panel gave Fleming a total of 39.67 points on its resume review and Rosado 29.00 points.  See Freeman Supp. Decl. at 3.  In categories B–E, the panel ranked Rosado and Fleming similarly: Fleming received 59 points, and Rosado received 57 points out of the 210 possible points.  See Freeman Supp. Decl., Ex. 4 (Doc. 51-5; Resume Rankings for Vacancy # '872).  But in category A, "Windows Server/Work Station Operating Systems Experience," the panel gave Fleming 60 points and Rosado only 30 points out of the 90 possible points.  Id.  All three panelists gave similar rankings in category A.  See id.  Because of Rosado's resulting resume score, the panel did not interview him.  See First Guthrie Decl. at 3; West Decl. at 3. After interviewing Fleming, the panel recommended that he and one other individual be hired because they received the highest scores of those interviewed who were still interested in the job.  See First Guthrie Decl.

at 4–6.  West and Guthrie have averred under oath that they were not directed or persuaded to recommend or not recommend a candidate.  See West Decl. at 5; First Guthrie Decl. at 6.

At the time he was considered for Vacancy # '872, Rosado had more years of IT experience overall and more years of experience at NAVFAC than Fleming.  See Rosado Dep. at 26.  Rosado also already had all of the required certifications for the job, while Fleming did not.  See id. at 27.  According to Rosado, after Fleming was hired, Fleming said "I do not know how I got the job. I don't know anything about ICS."  Id. at 24.  A day or so after Fleming was hired, he was transferred to Rosado's branch and did the same job as Rosado. See id.  In fact, Rosado helped to train Fleming.  See Rosado Decl. at 4.

Having reviewed the record, the Court finds that Rosado has not shown a prima facie case of discrimination or retaliation as to Vacancy # '872.  The undisputed record establishes that the selection panel ranked Fleming higher because his resume reflected greater experience in "Windows Server/Work Station Operating Systems."  See First Guthrie Decl. at 3; Resume Rankings for Vacancy # '872.  Specifically, Guthrie noted that Rosado did not have as "much recent significant experience" as Fleming.  First Guthrie Decl. at 6. Rosado has not produced any evidence showing that the information available to the selection panel demonstrated Fleming to be equally or less qualified than Rosado.  Although Fleming did not have some of the certifications that Rosado

possessed, the record shows that those certifications were not part of the qualifications considered by the selection panel. <u>See</u> Guthrie Decl. at 6. To the extent Rosado points to Fleming's statement that he did not know anything about ICS, the statement fails to create an issue of fact as to Fleming and Rosado's relative qualifications because it does not show that Fleming was equally or less qualified than Rosado. In fact, in category D, "ICS Systems Experience," both Rosado and Fleming received only 2 points out of the 30 possible points. <u>See</u> Resume Rankings for Vacancy # '872; Freeman Supp. Decl., Ex. 2: Selection Crediting Plan (Doc. 51-3) at 2. Thus, it appears neither of the two had substantial ICS knowledge. While Fleming and Rosado had equal experience with ICS, Fleming had greater experience with Windows servers and workstation operating systems which made him more qualified. Rosado does not dispute that Fleming had greater experience in those areas. Instead, he speculates that Fleming ended up doing the same job as Rosado because of Fleming's lack of qualifications; however, Rosado demonstrated no personal knowledge of the managers' reasons for the transfer. Notably, Rosado points to no evidence in the record which suggests that discrimination tainted the selection panel's decisions. Indeed, two panel members, West and Guthrie, did not even know of Rosado's national origin and age. <u>See</u> West Decl. at 2; First Guthrie Decl. at 2.

In addition, no evidence shows a causal connection between Rosado's prior EEO activity and this employment decision. Once again, two members of the selection panel, West and Guthrie, were unaware of Rosado's prior EEO activity. See West Decl. at 3; First Guthrie Decl. at 3. Rosado has produced no evidence that the third panel member Kohler subjected Rosado to any differential treatment during the selection process because of a retaliatory intent. In addition, Rosado's prior activity was temporally remote because the selection panel made the promotion decision in August 2014 while Rosado's most recent EEO complaint was filed on November 28, 2012. See Final Agency Decision at 1. This gap in time is "too long" to support an inference of retaliation. Brown, 597 F.3d at 1182 ("[I]n the absence of other evidence tending to show causation, if there is a substantial delay between the protected expression and the adverse action, the complaint of retaliation fails as a matter of law." (quoting Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1364 (11th Cir. 2007))); see also Rives v. LaHood, 605 F. App'x 815, 819 (11th Cir. 2015) (per curiam) (finding that the district court properly granted summary judgment because "the three-and-one-half-month delay between the filing of the EEO complaint and the selection of other employees for promotion was too long to establish the requisite causal link"). Therefore, on the merits, the Court finds that summary judgment is due to be granted in favor of the Secretary on Counts I, VI, and XI.

**B.      Counts III, VIII, XIII, and XVI: Ravenscroft's Promotion**

Rosado alleges that discrimination and retaliation against him tainted Freeman's decision to non-competitively convert Ravenscroft to a GS-12 employee.  Amended Complaint ¶¶ 26, 43, 58, 67.  In November 2014, Ravenscroft or Weaver asked Freeman to consider converting Ravenscroft from a temporary employee in CIO3 to a permanent employee in CIO4.  See Weaver Decl. at 5; Freeman Dep. at 11; Freeman Decl. at 12.  Ravenscroft could be converted non-competitively because he was in a temporary position and was entitled to a significant veteran's preference.  See Freeman Decl. at 12–13. Although Ravenscroft only had about six months of experience at NAVFAC, Weaver and Freeman believed that Ravenscroft would be a good fit in CIO4 because he had over ten years of ICS experience, had volunteered to cross train in CIO4, and possessed a bachelor's degree.  See Freeman Supp. Decl. at 7; Weaver Decl. at 5; Rosado Decl. at 11.  In contrast, when Weaver approached Rosado about becoming a CIO4 member, Rosado walked away.  See Weaver Decl. at 5.  NAVFAC's human resources (HR) office extended an offer to Ravenscroft on December 29, 2014, and his career appointment became effective on February 8, 2015.  See Freeman Supp. Decl. at 6–7; Freeman Decl. at 16.

The Secretary contends that Rosado cannot make out a prima facie case of discrimination or retaliation because Ravenscroft was more qualified than

Rosado and because there is no causal connection between Rosado's EEO activity and Ravenscroft's promotion.  <u>See</u> Motion at 22.  Although Rosado concedes that Freeman was permitted under NAVFAC's policies to non-competitively promote Ravenscroft, Rosado argues that he should have been promoted because he had ICS experience and had more years of satisfactory performance than Ravenscroft.  <u>See</u> Response at 21 & n.4 ("Plaintiff's contention is that he was more qualified for the position and that Ms. Freeman should have filled the position with the best qualified candidate or, at a minimum, given Plaintiff the opportunity to be considered.").  Rosado also asserts that ICS experience may not have been important because Joshua and Snead were transferred to CIO3 and Fleming said that he had no ICS experience.  <u>See</u> <u>id.</u> at 21–22.

The Court finds that Rosado has failed to show that he and Ravenscroft were similarly situated in all material respects.  While Rosado had more years of experience at NAVFAC, he does not show that he had equal or greater qualifications for the specific position with ICS.  Rosado does not provide evidence showing that Freeman or Weaver knew of Rosado's alleged ICS experience.  Moreover, Rosado does not specifically contend that his ICS experience was more significant than Ravenscroft's ten years of ICS experience.  Rosado's other argument about Fleming's, Joshua's, and Snead's lack of ICS experience is unavailing.  Regardless of whether CIO4 was able to hire

individuals without ICS experience, it is undisputed that having ICS experience made a candidate more qualified for the job.  See Weaver Decl. at 5–7; Freeman Decl. at 19 ("[A]lthough Mr. Joshua did not have the <u>ICS experience we were searching for</u>, he did have technical experience and competence in his resume . . . ." (emphasis added)).  Thus, Rosado has not presented evidence for the final element of a <u>prima facie</u> case of discrimination.[12]

As to the retaliation claims, Rosado has not shown a causal connection between his protected activity and Ravenscroft's promotion.  No evidence suggests that Freeman promoted Ravenscroft to deny the opportunity to Rosado.  Non-competitively converting Ravenscroft equally denied everyone else the opportunity to compete for the position, not just Rosado.  In sum, the evidence shows that Ravenscroft's promotion and Rosado's prior EEO activity were "wholly unrelated."  <u>Brungart v. BellSouth Telecomm., Inc.</u>, 231 F.3d 791, 799 (11th Cir. 2000).  Because Rosado has not presented evidence showing that discrimination or retaliation tainted Ravenscroft's promotion, the Court will grant summary judgment for the Secretary as to Counts III, VIII, XIII, and XVI.

---

[12] Because of the time involved in the competitive hiring process, being able to quickly promote Ravenscroft non-competitively was an advantage for CIO4.  <u>See</u> Freeman Decl. at 9–12 (discussing the selection process generally); Freeman Supp. Decl. at 10 (discussing how long it took to recruit for Vacancy # '490).  This fact further shows that Ravenscroft was not similarly situated to Rosado in "all material respects."  <u>Lewis I</u>, 918 F.3d at 1226.

C.      Counts II, VII, and XII: Vacancy # '490

Rosado maintains that Freeman discriminated and retaliated against him when she did not hire him for Vacancy # '490.  Amended Complaint ¶¶ 22, 40, 55.  Freeman asked the incoming CIO4 director, Charlie Weaver, to be the chairperson of a selection panel to fill the positions for Vacancy # '490.  <u>See</u> Freeman Decl. at 14.  Rosado was on the certification list of forty candidates. <u>See</u> <u>id.</u> at 16; Rosado Dep. at 30.  Weaver decided to pre-screen the forty eligible applicants to reduce the number of candidates to a manageable number.  <u>See</u> Weaver Decl. at 6.  To conduct his review, Weaver used seven criteria.  <u>See</u> <u>id.</u> Rosado's resume did not score enough points to survive Weaver's review.  <u>See</u> Freeman Decl. at 17.  According to Weaver, Rosado's resume did not list ICS experience, did not have current systems and networking experience, contained outdated IT terminology, and did not list some of the functions that Rosado had accomplished while working in CIO3.  <u>See</u> Weaver Decl. at 10–11; Freeman Decl. at 17, 19–20.

Weaver provided five resumes to the selection panel.  <u>See</u> Freeman Supp. Decl. at 10.  The panel ranked these resumes and offered interviews to the top three candidates.  <u>See</u> <u>id.</u>; Freeman Decl. at 17.  Only one of those candidates showed up for the interview.  <u>See</u> Freeman Supp. Decl. at 10; Freeman Decl. at 17.  Although the panel recommended hiring that candidate, he declined the offer on March 2, 2015.  <u>See</u> Freeman Supp. Decl. at 10; Freeman Decl. at 17.

At that point, the recruiting process had taken several months but produced no hires. See Freeman Supp. Decl. at 10. Because the certification list was due to expire on March 16, 2015, and CIO4 was falling behind on its work, Weaver and Freeman wanted to select candidates quickly from the existing certification list. See Freeman Decl. at 17–18; Weaver Decl. at 8. Although the most important qualification for the position was ICS experience, Freeman and Weaver could not find enough individuals with hands-on ICS experience. See Freeman Supp. Decl. at 10; Freeman Dep. at 9; Weaver Decl. at 8. Thus, Freeman and Weaver decided to consider candidates with current systems and networking experience who could be taught the ICS work. See Freeman Supp. Decl. at 10.

After other candidates declined or withdrew their applications, Snead and Joshua were the highest ranked candidates remaining. See Weaver Decl. at 9; Freeman Supp. Decl. at 11. Snead mentioned some ICS experience on his resume and had good network experience. See Weaver Decl. at 9. The panel ranked Snead's resume fourth out of the top five candidates. See Freeman Decl. at 18; Freeman Supp. Decl. at 10. In the initial review, Weaver ranked Joshua's resume ninth. See id. at 10; Freeman Supp. Decl. at 10–11. Joshua had no ICS experience, but he did have current systems and networking experience as a field service technician for the Navy Marine Corps Intranet (NMCI). See Weaver Decl. at 10; Freeman Supp. Decl. at 11. With Weaver's

recommendations, Freeman name-selected Snead and Joshua on March 11, 2015.  <u>See</u> Freeman Dep. at 8–9; Freeman Decl. at 19.

The Secretary argues that Snead and Joshua were more qualified than Rosado for the positions.  <u>See</u> Motion at 24–25. According to the Secretary, Joshua was more qualified because he possessed a bachelor's degree[13] and had good, current systems and networking experience that Rosado did not have.  <u>See</u> <u>id.</u>; Reply at 5.  The Secretary also asserts that Rosado's alleged ICS experience was not on his resume and that Rosado used outdated IT terminology on his resume.  <u>See</u> Reply at 4, 6 n.3.  The Secretary further argues that there is no causal connection between the promotion decision in March 2015 and Rosado's EEO complaint in December 2014, which mostly challenged decisions made before Freeman started.  <u>See</u> <u>id.</u> at 6.

In his Response, Rosado contends that the selection panel does not shield Freeman from accusations of discrimination or retaliation because the selection panel did not interview or recommend Snead and Joshua.  <u>See</u> Response at 12–13.  Rosado asserts that he had ICS experience that he mentioned on the questionnaire included in his application.  <u>See</u> <u>id.</u> at 16–18.  In addition, Rosado states that, contrary to Freeman's characterization, his resume showed substantial systems and networking experience.  <u>See</u> <u>id.</u> at 14–15.

---

[13]  Contrary to the Secretary's assertion, Joshua did not possess a bachelor's degree in 2015.  <u>See</u> Freeman Supp. Decl., Ex. 12 (Doc. 51-12; Joshua Resume '490) at 3.

The parties focus their arguments on the relative qualifications of Rosado

and the two selectees, Snead and Joshua.[14]  The most important experience for

the position was with ICS.  <u>See</u> Weaver Decl. at 8; Freeman Dep. at 9.  Rosado

_____

[14]  Rosado makes several other arguments that merit only a short discussion.  First, Rosado argues that Freeman tried to discourage him from applying by listing only one vacancy on the job posting when there were, in fact, two openings.  <u>See</u> Response at 11 & n.3.  This argument is unavailing because the incorrect posting affected all potential applicants equally.  In addition, Rosado was not discouraged from applying.  He applied for the position, and he identifies nothing that he would have done differently if the job posting had listed multiple vacancies.

Second, Rosado highlights that Freeman stated in one declaration that Snead scored a 31 on his resume while Rosado scored a 0.  <u>See</u> <u>id.</u> at 13.  According to Rosado, that statement is false or shows that the review was arbitrary.  <u>See</u> <u>id.</u>  It appears that Freeman was referring to the score that the selection panel gave Snead's resume.  <u>See</u> Declaration of Andrea Freeman, dated July 13, 2015 (Doc. 47-5; Freeman EEO Decl.) at 5; Freeman Decl., Attachment 6 (Doc. 37-6).  Because the selection panel did not review Rosado's resume, it makes sense that he did not have a similar score.  Thus, although Freeman was likely making an inapposite comparison in her EEO declaration, her statement does not create a reasonable inference that she was being deceptive or that the review process was arbitrary.

Third, Rosado asserts that Freeman is inaccurately maintaining that she hired Snead and Joshua for CIO4.  <u>See</u> Response at 14.  According to Rosado, Freeman's statement is not true because Snead and Joshua were quickly placed in CIO3.  <u>See</u> <u>id.</u>  The undisputed evidence shows that Freeman hired Snead and Joshua for CIO4.  <u>See</u> Freeman Dep. at 8–9; Freeman Decl. at 19.  Joshua initially worked in CIO4 for a few weeks but then moved to CIO3 to help with the labor shortage in that department.  <u>See</u> Weaver Decl. at 12; Freeman Dep. at 9; Freeman Decl. at 22.  Rosado has not produced evidence to rebut Weaver and Freeman's assertion that CIO3 needed Joshua's labor.  Snead was hired for CIO4 and remained there for several months before being transferred to CIO3 when Freeman restructured the divisions.  <u>See</u> Weaver Decl. at 12; Freeman Dep. at 9; Freeman Decl. at 27.  Thus, these transfers do not suggest that Freeman was being deceptive or discriminatory.

Fourth, Rosado contends that Weaver inappropriately considered his personal knowledge of Joshua's work on the NMCI contract.  <u>See</u> Response at 19.  But Joshua's experience with NMCI was on his resume.  <u>See</u> Joshua Resume '490 at 1–2.  Thus, Weaver's knowledge of Joshua's NMCI work does not reflect differential treatment of the two candidate's resumes.

But Weaver and Freeman may have used their personal knowledge in other ways.  For example, after the initially selected candidate declined the job offer, Freeman and Weaver discussed whether anyone in CIO had current systems and networking experience.  <u>See</u> Weaver Decl. at 9.  In addition, Freeman discussed how Rosado had walked away when Weaver asked about cross-training in ICS.  <u>See</u> Freeman Decl. at 18.  Further, Weaver characterized Rosado's recent experience as "primarily" in telecommunications, Weaver Decl. at 10, but Rosado's resume did not obviously reflect that characterization.  At best, however, this is a "mere scintilla of evidence" in support of Rosado's claims.  <u>Kesinger</u>, 381 F.3d at 1247.

alleges that, unlike Joshua, he had ICS experience. See Response at 16–18. But Rosado has produced no evidence that Freeman or Weaver knew of that experience. As part of his application on USAJOBS.gov, Rosado certified on an eligibility questionnaire that he had performed many ICS tasks. See Rosado Decl., Ex. 11 (Doc. 47-12) at 2–3. The HR office used the self-certification questionnaires to compile a list of candidates eligible for the position, but the questionnaires were not included in the resume package sent to Freeman and Weaver. See Freeman Supp. Decl. at 8. Similarly, while Rosado alleges that he attended an ICS seminar, his resume did not mention that attendance. See generally Rosado Decl., Ex. 10 (Doc. 47-11; Rosado Resume '490). Rosado knew that any relevant experience needed to be reflected on his resume because the job announcement stated that "[y]our resume is the key means we have for evaluating your skills, knowledge, and abilities, as they relate to this position." Rosado Decl., Ex. 6 (Doc. 47-7) at 2.

Apart from contending that he also had ICS experience, Rosado does not present any evidence suggesting that Snead was equally or less qualified than Rosado. Indeed, Snead's resume reflects qualifications greater than Rosado's because Snead's resume showed that he had some ICS experience and had strong systems and network experience. See Weaver Decl., Ex. 3 (Doc. 52-4; Snead Resume) at 1–2; Weaver Decl. at 9; Freeman Decl. at 18. Therefore,

Rosado has not made out a <u>prima</u> <u>facie</u> case of discrimination as to Snead's position.

With regard to Joshua, Weaver stated that he ranked Joshua higher than Rosado because Joshua's experience showed that Joshua had the technical ability to be trained to do ICS work.  <u>See</u> Weaver Decl. at 10. Specifically, Weaver stated that he recommended Joshua because Joshua's resume reflected more extensive and more current systems and networking experience than Rosado's resume.  <u>See</u> <u>id.</u> at 10–11.  In making her selections, Freeman relied on Weaver's recommendations.  Freeman Decl. at 19–20.  Rosado argues that the Secretary's explanation is pretextual because Rosado's resume showed substantial systems and networking experience.  <u>See</u> Response at 14–15.

Rosado's resume appears to reflect substantial systems and networking experience.  For example, Rosado stated on his resume that in his job at NAVFAC he provided technical support for "desktop and network services," configured "several systems at different locations," worked as a "System Administrator," diagnosed and repaired "network hardware and application issues in coordination with vendor in support of the networking infrastructure in order to meet the overall systems objectives," installed and maintained operating systems, worked as an "Information Assurance Manager" processing access requests "required for network user accounts," and worked with clients "to define requirements for new systems [and] network configuration and

operational components." Rosado Resume '490, at 2–3. Rosado had experience providing support for NMCI users. See id. at 3. Rosado also listed coursework or certifications for "Server 2008," "Network Plus," and "Server 2012." Id. In addition, Rosado's employment from August 2004 to November 2007 was as a "System Administrator" for the Navy Recruiting District in Jacksonville. Id. at 3–4. At this position, Rosado performed many systems- and network-related tasks. See id.

Even so, Weaver explains that he discounted Rosado's systems and networking experience at NAVFAC because "[a]s reflected in his resume, Mr. Rosado's position in CIO3 in the Telecommunication Services . . . deals primarily with cell phones and telephone networks and systems." Weaver Decl. at 10; see Freeman Supp. Decl. at 12 ("Mr. Rosado's systems and networking experience, not related to telecommunications support services, occurred prior to him being hired at NAVFAC SE in November 2007."). In addition, Weaver stated that Rosado had old terminology on his resume, such as the term "AIM" when the current term is "ISSM."[15]  Weaver Decl. at 11; see Freeman Decl. at 17. Rosado has not disputed or pointed to any evidence that contradicts either of Weaver's assessments.

---

[15] Rosado argues that Freeman demonstrated age bias by stating that Rosado's resume contained outdated terminology. See Response at 18. But Weaver noted that having current technical expertise would be helpful so that the selected candidate could easily learn CIO4's work. See Weaver Decl. at 10. Thus, Weaver and Freeman's comments show a concern about the relevance of Rosado's knowledge, not about Rosado's age.

Weaver states that, compared to Rosado, Joshua "had more current (up to 2014) and extensive systems administrator and networking administration experience." Weaver Decl. at 11. According to Weaver, "Mr. Joshua's resume contained System Administrator experience in Microsoft Servers, extensive workstation experience, and Network Administrator experience in Switches and Routers." Id. at 10. Joshua's resume listed his position at Hewlett Packard as an "NMCI Tier 1 Service Desk Analyst." Joshua Resume '490, at 1. In this role, Joshua resolved network connectivity issues, installed new PCs and laptops, replaced and upgraded hardware, managed computer accounts, performed duties on classified and unclassified networks, helped customers to configure home networks with "small routers and hubs to connect to military network," configured "large network scanners to scan documents in over the network and deliver them to shared drives," and managed print servers and "admin accounts." Id. at 1–2. He also worked with the network team "on a daily basis to troubleshoot both LAN and WAN environments" and worked "directly with the Information Assurance team to ensure every network device adheres to I.T. Security policies." Id. at 2. Joshua also resolved issues "ranging from individual switches and routers to large network outages," and had training in managing and maintaining "Win Server 2003." Id. at 2–3.

The record before the Court also reflects that Joshua's resume showed that he worked with systems and networks "on a daily basis" through 2014, id.

at 2, whereas Rosado's most extensive systems and networks experience was between 2004 and 2007, see Rosado Resume '490, at 3–4.  For example, both candidates mentioned routers and switches on their resumes, but Joshua's experience was between 2009 and 2014, while Rosado's experience was between 2004 and 2007.  See Joshua Resume '490, at 2; Rosado Resume '490, at 3–5.  In consideration of the record, Rosado has not produced evidence to dispute Weaver's assessment that Joshua was more qualified because he had more extensive and more current systems and network experience.  As a result, Rosado has failed to make out a prima facie case of discrimination.

For his retaliation claim, Rosado has not shown that there is a causal connection between his prior EEO activity and Freeman's decision to hire Snead and Joshua.  Rosado's most recent EEO complaint was three months before Freeman's decision.  See Brown, 597 F.3d at 1182 (finding that a "three-month interval . . . is too long" to support an inference that protected activity and the adverse employment action were casually related); see also Rives, 605 F. App'x at 819 (similar).  Moreover, Weaver is the one who initially ranked the resumes and considered Joshua's resume to be better than Rosado's.  See Weaver Decl. at 6; Freeman Supp. Decl. at 9.  Weaver recommended hiring Snead and Joshua.  See Freeman Dep. at 8–9, 19.  And Weaver stated that Freeman did not direct or persuade him to do anything during the review process.  See Weaver Decl. at 11.  Rosado has presented no reason why Weaver would want to retaliate

against Rosado.  Weaver was not the object of any of Rosado's prior complaints. In fact, Weaver was a witness for Rosado in one of his prior EEO actions.  See id. at 2.  Because Rosado has not produced evidence to support a prima facie case of discrimination or retaliation, summary judgment is due to be granted in favor of the Secretary on Counts II, VII, and XI.

### D.    Counts IV, IX, XIV, and XVII: Temporary Promotion

Rosado alleges that discrimination and retaliation played a part in Freeman's decision not to officially recognize his temporary promotion with a pay increase.  Amended Complaint ¶¶ 30, 46, 61, 70.  In the Summer of 2015, in anticipation of an EEO mediation, Freeman asked Pruitt whether Rosado would be interested in receiving a temporary promotion to GS-12 to gain experience.  See Freeman Decl. at 23; Freeman Supp. Decl. at 13.  Freeman did not authorize Pruitt to actually offer the promotion.  See Freeman Decl. at 24. Unknown to Freeman, on August 10, 2015, Pruitt offered Rosado the opportunity for "cross training and temporary promotion."  See id.; Temporary Promotion Email at 1; Rosado Dep. at 34–35.  Pruitt told Rosado that Fleming was moving to CIO4 for training and that Rosado could do Fleming's GS-12 job temporarily.  See Rosado Dep. at 35.  Rosado alleges that on August 10, 2015, he accepted the offer for a temporary promotion.  See id. at 34.  At the time, Fleming was the primary person who handled wireless and landline services. See id. at 37.  For around 60 days before the EEO mediation, Rosado worked

with wireless and landline services in Fleming's place.  See id. at 35–36; Rosado Decl. at 12.

At the EEO mediation on September 28, 2015, Freeman offered Rosado a temporary promotion to GS-12.  See Rosado Dep. at 35; Freeman Decl. at 24; Freeman Supp. Decl. at 13.  Rosado said that he did not accept Freeman's offer because he had already accepted the offer from Pruitt.  See Rosado Dep. at 35; Freeman Decl. at 24.  Freeman then withdrew the offer.  See Rosado Dep. at 36. Freeman told Rosado that Pruitt did not have the authority to make such an offer.  See Freeman Decl. at 24.  Freeman also offered Rosado small assignments at the GS-12 level, but Rosado declined.  See id. at 25.

It is undisputed that Rosado never received extra pay for the GS-12 work that he was doing, see Rosado Dep. at 36–37, and that Freeman never processed a temporary promotion, see id. at 36; Freeman Decl. at 25.  According to Freeman, a true temporary promotion to a vacant position comes with a pay increase and requires HR approvals and paperwork, but a detail to an occupied higher-grade position does not come with a pay increase and is not a true promotion.  See Freeman Supp. Decl. at 15.  Pruitt had the authority to authorize a detail but not a true temporary promotion.  See id.

The Secretary argues that Rosado cannot show a prima facie case of discrimination or retaliation because he cannot point to anyone equally or less qualified who received the temporary promotion.  See Motion at 26.  The

Secretary asserts that Rosado never received an official temporary promotion because Rosado declined Freeman's offer at the EEO mediation.[16]   See id. According to the Secretary, there is no evidence that any protected characteristic tainted the decision.   See Reply at 7.   In his Response, Rosado argues that he did not accept Freeman's offer at the EEO mediation because he had already accepted Pruitt's offer that "was not contingent on" settling any EEO claim.   See Response at 23.   Rosado maintains that he "has established a prima facie case and has again demonstrated that Defendant's reasons for its action is false."   Id.[17]   Rosado contends that he has shown retaliation because

---

[16]   Rosado objects based on Rule 408 of the Federal Rules of Evidence (Evidence Rule(s)) to the consideration of Freeman's offer and statements made during the EEO mediation.   See Response at 23.   Evidence Rule 408 provides:

> Evidence of the following is not admissible—on behalf of any party—either to prove or disprove the validity or amount of a disputed claim . . . :
> (1) furnishing, promising, or offering . . . a valuable consideration in compromising or attempting to compromise the claim; and
> (2) conduct or a statement made during compromise negotiations about the claim . . . .

Evidence Rule 408(a).   Freeman's offer of a temporary promotion was made to settle Rosado's then-existing EEO claims.   Rosado later raised a new EEO claim about the temporary promotion.   Rosado's claim about the temporary promotion was not at issue during the EEO mediation.   Therefore, Evidence Rule 408 does not bar using statements made at the EEO mediation to prove or disprove the validity of Rosado's claim about the temporary promotion.

[17]   Rosado also asserts that Pruitt admitted that he offered the temporary promotion to Rosado and that Rosado was doing the work since August 10, 2015.   See Response at 22–23 (citing Rosado Decl., Ex. 13: Declaration of Wyatt Pruitt (Doc. 47-14; Pruitt Decl.) at 2).   Rosado cites a declaration purporting to be from Pruitt.   But as the Secretary notes, the declaration is not signed.   See Pruitt Decl. at 3; Reply at 7.   Therefore, the Court does not rely on the declaration.   See 28 U.S.C. § 1746.   Even if the Court did consider the declaration, it would not raise a genuine issue of material fact.   In the declaration, Pruitt states that Rosado has been "providing coverage" for another individual and that the position "was never vacated as intended but cross training still occurred."   Pruitt Decl. at 2.   Pruitt declares that he asked

"Freeman's rejection of the temporary promotion occurred on the very day Mr. Rosado was mediating his EEO complaint." Id. at 24.

The Court finds that Rosado has not demonstrated a prima facie case of discrimination.   Rosado has not pointed to anyone similarly situated in all material respects who received more favorable treatment, such as a temporary promotion with pay.   Alternatively, Rosado has not shown that, "after his rejection, the position remained open and the employer continued to seek applicants from persons of [his] qualifications." McDonnell Douglas Corp., 411 U.S. at 802.  Either Pruitt offered something that he could not authorize (a true temporary promotion with a pay increase) or he offered a temporary detail to a GS-12 position so that Rosado could gain more experience.   In either case, Freeman had no reason to initiate and file the paperwork necessary to secure increased pay for Rosado.   See Freeman Supp. Decl. at 15.   Rosado has presented no evidence that he or anyone else even asked Freeman to initiate the HR process to secure an official promotion and increased pay.  And Rosado

---

Rosado "if he would not mind covering the work" while the other individual in the position was absent for "OJT" (on-the-job training). Id.  Thus, Pruitt's version of events, which Rosado does not dispute, reveals that Pruitt merely asked Rosado to cover the duties of someone while the other person was cross-training elsewhere and that Rosado could not have received an increase in pay because the GS-12 position was never vacated.  See Freeman Supp. Decl. at 14–15 (explaining that a temporary promotion is to a vacant position).  In addition, nothing in the declaration supports Rosado's argument that he was promised a position with a pay increase.

has not demonstrated that Pruitt or Freeman was motivated at all by Rosado's race, national origin, or age.

Although Rosado speculates that Freeman "rejected" his temporary promotion in retaliation, Rosado fails to produce evidence that Freeman rejected anything that was presented to her.  Rosado performed duties that he agreed to perform, and no competent evidence shows that Freeman or Pruitt promised Rosado an increased salary.  Rosado never received an official temporary promotion with a pay increase because he rejected the offer when Freeman—the official with the authority to make such an offer—made it.  See Rosado Dep. at 35; Freeman Decl. at 24.  Therefore, summary judgment in favor of the Secretary is due to be granted as to Counts IV, IX, XIV, and XVII.

### E.    Counts V, X, XV, and XVIII: Supervisory Position

Rosado asserts that discrimination and retaliation tainted Freeman's decision not to hire him as the new CIO3 director in 2018.  Amended Complaint ¶¶ 34, 49, 64, 73.  After Pruitt left CIO, Freeman asked Weaver to chair a selection panel for Pruitt's replacement.  See Freeman Decl. at 28.  Freeman also asked Ryan Hall, Guthrie, and Susan Brink to serve on the panel.  See id.; Declaration of Ryan Hall (Doc. 53-5; Hall Decl.) at 3.  Brink was an EEO representative who did not participate in ranking the candidates.  See Freeman Decl. at 28; Weaver Decl. at 13.  Hall was unaware of Rosado's race, national origin, age, or prior EEO activity.  See Hall Decl. at 2–3, 9.

The certification list for the position included seventy-nine candidates. See Freeman Decl. at 29.  Freeman performed an initial review of the resumes, reducing the number of candidates to twenty-two, including Rosado and Joshua. See id.  Freeman provided the twenty-two resumes to the selection panel and gave them five categories with criteria for ranking the candidates.  See id.  The five categories were management experience, technical experience, network experience, policy/planning experience, and certification/education.  See id. at 29–30.  Freeman established the categories and criteria for the resume review before the job announcement.  See id. at 33.

Each panelist ranked the twenty-two resumes.  See Weaver Decl. at 13. The criteria information had to be listed in the resume for the candidate to get points so that panel members could not give greater consideration to those of whom they had personal knowledge.  See Freeman Decl. at 31.  The panel gave Rosado's resume a weighted score of 51.34 and Joshua's resume a weighted score of 65.34.  See Freeman Supp. Decl., Ex. 15 (Doc. 51-15; Supervisor Resume Rankings) at 1–2.  All three individual panel members ranked Joshua's resume higher than Rosado's.  See Declaration of Clarence Guthrie, dated August 31, 2018 (Doc. 53-4; Second Guthrie Decl.) at 5; Hall Decl. at 4–5.  In the most heavily weighted category, "Management Experience," the panel gave Rosado 7 points and Joshua 13 points.  See Supervisor Resume Rankings at 1–2; Weaver Decl. at 14.  In the next most heavily weighted category, "Policy/Planning

Experience," the panel assigned Rosado 5 points and Joshua 9 points.  See Supervisor Resume Rankings at 1–2.  In the category "Technical Experience," the panel gave Rosado 12 points and Joshua 10 points.  Id.  For "Network Experience," the panel awarded Rosado 11 points and Joshua 9 points.  Id. Finally, in "Certifications/Education," the panel gave both Joshua and Rosado 3 points.  Id.

The record reflects that Joshua's resume demonstrated recent supervisory experience because he had volunteered to temporarily serve as the acting director of CIO1 from October 2017 to January 2018.  See Freeman Decl. at 28.  In this position, Joshua supervised eleven IT employees for 120 days. See Freeman Supp. Decl. at 18.  Rosado did not volunteer to serve in that capacity.  See Freeman Decl. at 33.  Rosado states that he had previous supervisory experience when he filled in for the CIO3 director in his absences on several occasions.  See Rosado Decl. at 7–8.  But Rosado did not list on his resume any indication that he had acted as a CIO division director.  See Freeman Supp. Decl. at 18.  The supervisory experience on Rosado's resume was prior to 2007 and involved supervising two contract employees in a prior position and students, and seven to ten technicians in the Marine Corps.  See id.; Freeman Supp. Decl., Ex. 18 (Doc. 51-18; Rosado Resume for GS-13 Position) at 4–5.  Joshua and Rosado's resumes reflected other relevant differences.  Rosado had nearly 40 years of IT experience while Joshua had over

20 years of experience.  <u>See</u> Freeman Decl. at 33.  Joshua possessed a bachelor's

degree; Rosado possessed an associate's degree.  <u>See</u> <u>id.</u> at 32–33.

After the selection panel conducted its resume review, the panel members

decided to interview the top ten candidates still interested in the job, including

Rosado and Joshua.  <u>See</u> <u>id.</u> at 31; Rosado Dep. at 39.  Freeman, based on prior

consultation with Pruitt, developed standardized interview questions.  <u>See</u>

Freeman Decl. at 31.  Rosado's average interview score was 56, and Joshua's

average interview score was 79.33.  <u>See</u> <u>id.</u> at 32; Freeman Decl., Attachment

11 (Doc. 37-11).  The interview panel explains the differing scores:

- During his interview, Rosado did not discuss his experience.  <u>See</u> Hall Decl. at 6.

- Rosado did not fully answer all the questions.  <u>See</u> Second Guthrie Decl. at 6; Hall Decl. at 6.

- Instead of describing his experience, Rosado stated several times, "It's in my resume."  Hall Decl. at 6.

- In contrast, Joshua expanded on his answers to the questions, gave more concrete answers, and discussed his experience and skills in the interview.  <u>See</u> <u>id.</u>

After the selection panel applied a 40% weight to the resumes and a 60%

weight to the interviews, Rosado had 54.13 points and Joshua had 73.73 points.

<u>See</u> Freeman Decl., Attachment 9 (Doc. 37-9).  The panel recommended hiring

Joshua.  <u>See</u> Freeman Decl. at 32; Selection for GS-13 Position at 1; Freeman

Supp. Decl., Ex. 16 (Doc. 51-16); Weaver Decl., Ex. 5 (Doc. 52-6) at 5.  Guthrie

and Hall were not directed or persuaded to recommend or not recommend a particular candidate.  <u>See</u> Second Guthrie Decl. at 9; Hall Decl. at 10. Ultimately, Freeman followed the panel's recommendation.  <u>See</u> Freeman Dep. at 14.

The Secretary contends that Rosado was not selected for the supervisory position because Joshua was more qualified.  <u>See</u> Motion at 26.  The Secretary argues that Joshua was more qualified because he served as CIO1's temporary director, had a bachelor's degree, and had better technical experience than Rosado.  <u>See</u> <u>id.</u> at 27–28; Reply at 8.  The Secretary also asserts that Joshua far outshined Rosado in the interviews where Rosado gave vague answers and did not fully address questions.  <u>See</u> Reply at 8–9.

Rosado alleges that he had supervisory experience from his military service and from acting as the director of CIO3 when the director was absent. <u>See</u> Response at 25.  He argues that Freeman added a degree requirement at "the 11th hour" and that a bachelor's degree did not relate to the job duties.  <u>Id.</u> Rosado also asserts that he had as much systems and networking experience as Joshua and had more years of IT experience overall.  <u>See</u> <u>id.</u>

The Court finds that Rosado has not set forth evidence to create a triable issue of fact as to whether the process for hiring Joshua was tainted by discrimination.  Rosado cannot make out a <u>prima</u> <u>facie</u> case of discrimination because the record evidence shows that Joshua was more qualified than Rosado

to be a CIO director.  Joshua had recent, relevant supervisory experience as the acting director of CIO1.  <u>See</u> Freeman Decl. at 28, 33; Weaver Decl. at 15; Freeman Supp. Decl. at 18.   Rosado's resume did not demonstrate any comparable recent significant supervisory experience and showed no supervisory experience at CIO.  <u>See</u> Freeman Supp. Decl. at 18.  <u>See generally</u> Rosado Resume for GS-13 Position.  Without recent supervisory experience at CIO, Rosado was less qualified than Joshua to lead CIO3.  <u>See</u> <u>Adams v. Cobb</u> <u>Cnty. Sch. Dist.</u>, 242 F. App'x 616, 619–20 (11th Cir. 2007) (per curiam) (explaining that the plaintiff was "comparatively underqualified" to be a school principal when other candidates had experience as an assistant principal but the plaintiff did not).  In addition, the selection panel found Joshua to be more qualified because in his interview he gave answers that expanded on his experience.  <u>See</u> Hall Decl. at 6.  In contrast, Rosado's answers were vague and failed to show how his experience made him as strong a candidate as Joshua. <u>See</u> Second Guthrie Decl. at 6; Hall Decl. at 6.  Notably, Rosado does not dispute Guthrie and Hall's characterizations of Rosado and Joshua's interview answers. Even if Rosado had more technical experience than Joshua, Joshua's greater supervisory experience made him more qualified for being the CIO3 director, a supervisory position.

Moreover, Joshua's slight educational advantage over Rosado provided another reason for selecting Joshua.[18]  See Weaver Decl. at 15–16.  Although Rosado asserts that Freeman changed the education requirements "at the eleventh hour," the undisputed record evidence is that Freeman did not change the language about having a degree.  See Freeman Supp. Decl. at 16–17.  To the contrary, she added certifications that made it easier for applicants to be placed on the list of eligible candidates.  See id.

Rosado also has presented no evidence that his prior EEO activity had any connection with the decision to hire Joshua for the supervisory position.  In fact, Rosado does not even argue that retaliation tainted this employment decision.  See Response at 24–25.  Accordingly, the Court will grant summary judgment in the Secretary's favor on Counts V, X, XV, and XVIII.

## F.    April 1, 2015 Meeting

Along with his arguments about the specific incidents from which his claims arise, Rosado asserts that Freeman's comments during an April 1, 2015 meeting generally support his claims of retaliation.   On March 31, 2015,

---

[18]    Relying on Griggs v. Duke Power Co., 401 U.S. 424 (1971), Rosado argues that requiring a degree can be discriminatory.  See Response at 25.  But the Court in Griggs did not forbid viewing degrees as a plus factor in favor of a candidate.  See Griggs, 401 U.S. at 436 ("Nothing in the Act precludes the use of testing or measuring procedures; obviously they are useful.  What Congress has forbidden is giving these devices and mechanisms controlling force unless they are demonstrably a reasonable measure of job performance.").  Joshua's bachelor's degree was not given "controlling force."  It was simply one of several factors that showed him to be more qualified than Rosado.

Freeman heard that Fleming and Rosado had refused to complete a work assignment after Fleming questioned whether it was their job to perform that kind of work.  <u>See</u> Freeman Decl. at 20–21.  Freeman also had recently learned that some employees in CIO1 did not want to complete some tasks.  <u>See</u> <u>id.</u> at 21.

Because Freeman wanted everyone to get the same message, she generally addressed the issue of refusing work assignments in a personnel meeting on April 1, 2015.  <u>See</u> Freeman Dep. at 5.  Freeman stated that the CIO employees had all worked hard to change the climate of CIO to make it a good place to work.  <u>See</u> Freeman Decl. at 21. She also told them something to the effect of, "If you don't want to be here, the door is open. I'm tired of people walking on eggshells. I'm not going backwards. We're moving forward. I'm not afraid of EEO or the union. Bring it on."  <u>See</u> Rosado Dep. at 20; Freeman Dep. at 4–5.

Rosado contends that Freeman's statements during the meeting shed light on his claims for retaliation because Freeman mentioned EEO activity while not being aware of any other CIO employee who had filed an EEO complaint.  <u>See</u> Response at 6.  Rosado argues that Freeman's statements were <u>per</u> <u>se</u> retaliatory like statements that the Equal Employment Opportunity Commission (EEOC) has condemned.  <u>See</u> <u>id.</u> at 7–9.  In contrast, the Secretary

maintains that Freeman did not single out or berate Rosado.  <u>See</u> Motion at 12.[19]

The Court finds that, in context, Freeman's statements do not suggest any retaliatory intent or animus toward those who file EEO complaints. Freeman was addressing complaints about performing work outside the employees' job descriptions.  <u>See</u> Freeman Decl. at 20–21.  She was not addressing complaints about discrimination based on protected characteristics or about retaliation for EEO activity.  Moreover, Freeman's statements did not discourage filing EEO complaints.  <u>See</u> Rosado Dep. at 20 ("I'm not afraid of EEO or the union. Bring it on.").  Unlike the statements in the EEOC cases cited by Rosado in his Response, Freeman's statement did not object to contacting the EEO, criticize anyone for filing a complaint, or suggest that anyone would face adverse employment actions for filing a complaint.  <u>See</u> Response at 7 (stating that filing an EEO suit was the "wrong way to go about getting a promotion"); <u>id.</u> (mentioning EEO complaints and then stating, "What goes around, comes around"); <u>id.</u> at 7–8 (warning a complainant that "her EEO claim would polarize the office"); <u>id.</u> at 8 (objecting to "complainant's contacts with EEO office"); <u>id.</u> (criticizing complainant for "seeking agreement with co-workers that management decisions were biased or discriminatory").  The fact

---

[19]  While the Secretary asserts that Freeman's statements encouraged rather than discouraged EEO activity, <u>see</u> Reply at 6 n.4, the Court sees little support for this contention.

that Freeman did not know of any other employees who had filed EEO complaints does not demonstrate that Freeman's otherwise innocuous statements were expressing animus toward Rosado. Therefore, Freeman's statements at the April 1, 2015 meeting do not support Rosado's claims.[20]

## V.     Conclusion

Rosado has failed to demonstrate <u>prima facie</u> cases of discrimination and retaliation, nor has he produced a convincing mosaic of circumstantial evidence showing that he suffered discrimination or retaliation. Applying the legal standard from <u>Babb I</u>, Rosado has failed to present evidence creating a genuine issue of material fact as to his claim that he suffered differential treatment because of discrimination or retaliation or that discrimination or retaliation tainted NAVFAC's employment decisions. Therefore, summary judgment in favor of the Secretary is due to be granted on all counts of the Amended Complaint. Accordingly, it is

**ORDERED:**

1. Defendant's Motion for Summary Judgment (Doc. 34) is **GRANTED**.

---

[20]   Rosado briefly contends that an inference of discrimination arises from the facts that, in August 2015, he was the only Hispanic employee in CIO, was the only employee who had prior EEO activity, and was substantially older than the promoted candidates. <u>See</u> Response at 9; CIO Statistics at 1–2. Without an analytic foundation of the characteristics and qualifications of those who applied to work at CIO and who applied for the promotions, Rosado's statistics are "virtually meaningless." <u>Brown v. Am. Honda Motor Co.</u>, 939 F.2d 946, 952–53 (11th Cir. 1991).

2. The Clerk of the Court is directed to enter **JUDGMENT** in favor of Defendant Carlos Del Toro, Secretary, Department of the Navy.

3. The Clerk of the Court is further directed to terminate any remaining pending motions and deadlines as moot and close the file.

   **DONE AND ORDERED** in Jacksonville, Florida, on November 17, 2022.

**MARCIA MORALES HOWARD**
United States District Judge

lc30
Copies to:

Counsel of Record